**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHIDI U. UCHE, M.D.,

      Plaintiff,

v.                                  Case No:   3:12-cv-865-J-32JBT

ST. LUKES-ST. VINCENTS
HEALTHCARE, INC.,

      Defendant.

---

# O R D E R

On June 5, 2012, St. Vincent's[1] revoked Dr. Chidi Uche's privileges at its St.

Luke's Hospital and rejected his application for reappointment to the medical staff.[2]

(Doc. 119-7 at 19). According to St. Vincent's, this decision was the result of Dr. Uche's

failure to perform his duties as a hospitalist, as evidenced by his failure to promptly

return nurses' phone calls, to properly and timely fill out patient records, and to show

improvement on these issues despite repeated disciplinary action. Dr. Uche asserts

that his privileges were revoked as the result of racial discrimination, retaliation for

complaints of racial discrimination, retaliation for complaints that the hospital was

engaged in negligent medical care and medical misdiagnosis, and negligence in his

---

[1] Defendant, a parent corporation owning both St. Luke's Hospital and St. Vincent's Hospital – Riverside, will be referred to as St. Vincent's. St. Luke's Hospital will be referred to as St. Luke's, although it is now known as St. Vincent's Medical Center – Southside.

[2] Dr. Uche's application for re-appointment at St. Vincent's – Riverside was also rejected because of the events at St. Luke's. (Doc. 121-5 at 4-5).

peer review hearing. (Doc. 52). This case is before the Court on Defendant's Motion for Summary Judgment (Doc. 118) and exhibits (Doc. 119; Doc. 120; Doc. 121), as well as Plaintiff's response (Doc. 169) and exhibits (Doc. 170; Doc. 171; Doc. 172; Doc. 173). The Court held oral argument on July 21, 2014, the record of which is incorporated by reference. (Doc. 207).[3]

## I.    FACTS[4]

On May 12, 2008, Dr. Uche received privileges to admit patients as a hospitalist at St. Luke's. (Doc. 173-1 at 2). On July 17, 2008, Dr. Uche met with Dr. Perry, St. Vincent's Chief Medical Officer, as well as Dr. Rebenack and Mr. Mayher to discuss a number of issues that had become apparent in Dr. Uche's first two months on the job. (Doc. 118-6 at 31). Amongst these issues were Dr. Uche's alleged failure to respond to multiple pages from a nurse and refusal to write timely discharge orders. (Doc. 118-6 at 31).

On March 18, 2009, Dr. Perry and Dr. Uche again met to discuss complaints the nursing staff had made about Dr. Uche's failure to respond to calls, refusal to write discharge orders, and delays in care. (Doc. 118-5 at 3). Dr. Perry and Dr. Rebenack met with Dr. Uche yet again on October 12, 2010 to discuss continuing issues with

---

[3] Part of the delay between argument and this decision was this Court's referral of the case to the Magistrate Judge for a settlement conference, which was unsuccessful.

[4] The evidence before the Court is viewed in a light most favorable to Dr. Uche. See Gregory v. First Title Of Am., Inc., 555 F.3d 1300, 1301 (11th Cir. 2009).

delays in care, Dr. Uche's failure to promptly return calls and pages, and other issues. (Doc. 118-5 at 4).

Next, on January 21, 2011, Dr. Tunstill and Dr. Perry spoke with Dr. Uche to inform him that they had received still more complaints that Dr. Uche delayed in returning nurses' phone calls. (Doc. 118-5 at 6). Although Dr. Uche believed the problems to be the nurses' fault, he was asked to appear before the Medical Staff Executive Committee ("MSEC") on February 7, 2011 to discuss the call-back issue. (Doc. 118-5 at 6).[5] At that meeting, Dr. Uche agreed to various changes to resolve the communication issues. (Doc. 118-5 at 7).

On May 17, 2011, Dr. Uche was informed by letter that the MSEC believed his communication issues had continued even after the February 7 meeting. (Doc. 118-5 at 8). The letter also advised Dr. Uche that several patients had complained about his poor communication skills, that he had failed to timely authenticate history and physical forms, and that his discharge summaries did not meet the hospital's requirements. (Doc. 118-5 at 8-9). He was warned that continued misconduct could result in corrective action. (Doc. 118-5 at 8).

On June 8, 2011, one of Dr. Uche's patients exhibited signs of a stroke. (Doc. 119-7 at 6). Nurses attempted to call Dr. Uche three times regarding the patient, but took two and a half hours to reach him. (Doc. 118-5 at 10). Two days later, Dr, Perry

---

[5] The MSEC includes up to fourteen doctors with voting rights, including the Chief Medical Officer. (Doc. 118-3 at 53). Being called before the MSEC is a very serious and rare matter. (Doc. 119-5 at 3). During Dr. Uche's time at St. Luke's only one other physician was ever called before the MSEC. (Doc. 119-5 at 3).

summarily suspended Dr. Uche for his continued failure to respond to calls. (Doc. 118-5 at 10). Dr. Uche was told that he could request to appear before the MSEC to defend his actions, but he did not do so. (Doc. 119-7 at 7).

Dr. Uche's suspension lasted seven days, until he was reinstated by the MSEC with certain requirements. (Doc. 119-7 at 8). Dr. Uche agreed that he would "adopt an answering service protocol which would require his answering service to call back every 15 minutes after receiving a call from nursing to inquire and confirm that he had returned the nursing call . . . ." (Doc. 119-7 at 8). Dr. Uche also agreed to provide the MSEC with access to his answering service's call records, to bring current all patient documentation, and to write a letter accepting responsibility for his actions. (Doc. 119-7 at 8). In a letter memorializing the suspension, Dr. Uche was told that continued problems would cause the MSEC to reconvene and that there would be "a high probability of recommendation . . . for full suspension or permanent revocation of privileges . . . ." (Doc. 118-5 at 12).

Nevertheless, Dr. Uche unilaterally cancelled his answering service. (Doc. 119-7 at 9). The hospital discovered the cancellation on July 28, 2011, when the microbiology laboratory asserted that it could not reach Dr. Uche to tell him that one of his recently discharged patients tested positive for a bacterial growth. (Doc. 119-7 at 8). Dr. Uche also went to Orlando on July 17, allegedly without arranging for a covering physician, instead leaving only his Advanced Registered Nurse Practitioner to care for his patients. (Doc. 119-7 at 9).

On August 1, 2011, Dr. Uche met with the MSEC to discuss a number of complaints levied against him, including the Orlando incident and the alleged failure to return three calls about the critical lab result. (Doc. 118-6 at 155). The MSEC considered revoking Dr. Uche's privileges immediately, but voted 6-3 against doing so. (Doc. 118-10 at 53). Instead, the MSEC decided to give Dr. Uche the choice of either being summarily suspended or accepting seven restrictions on his privileges, including limitations on the number of patients he could see and the reinstatement of the answering service he had cancelled. (Doc. 118-10 at 54). Despite this vote, on August 3, 2011, Dr. Perry told Dr. Uche that he would be summarily suspended, effective August 4. (Doc. 119-7 at 10). This suspension's effective date was later moved to August 5 at 5:00 p.m., and then rescinded altogether. (Doc. 119-7 at 11).

On September 12, 2011, the MSEC met and decided to revoke Dr. Uche's privileges at the hospital, which decision was unanimously agreed upon at a special meeting on September 22. (Doc. 119-7 at 13).[6] In part, St. Vincent's asserts this decision was based upon the belief that Dr. Uche lied at the August 1 meeting when providing explanations regarding his lack of coverage during the Orlando trip and his failure to return the lab's phone calls. (Doc. 118-10 at 58-59). Dr. Uche was notified of the revocation recommendation on September 23, 2011, (Doc. 119-7 at 13), and he requested a hearing in late October 2011. (Doc. 119-7 at 14). That peer review hearing was held on December 8, 2011, January 12, 2012, and January 17, 2012 before a

---

[6] Thirteen of the fourteen MSEC voting members (all doctors), including Dr. Perry and Dr. Tunstill, were present at the September 12 meeting where the MSEC first decided to revoke Dr. Uche's clinical privileges. (Doc. 118-10 at 58).

Hearing Committee composed of seven doctors, none of whom were in business competition with Dr. Uche. (Doc. 119-7 at 14-16).[7] In between the second and third nights of the hearing, Dr. Uche's counsel withdrew. (Doc. 119-7 at 16). Dr. Uche proceeded nonetheless, using only his own testimony, as he called no other witnesses. (Doc. 119-7 at 16). On January 23, 2012, the Hearing Committee voted unanimously to support the MSEC's recommendation. (Doc. 119-7 at 17).

Dr. Uche requested a rehearing and was denied. (Doc. 119-7 at 18). He then appealed the hearing decision. (Doc. 119-7 at 19). The Appellate Review Panel, appointed by the Chairman of the Board of Directors, unanimously affirmed the MSEC's recommendation and the Hearing Committee's decision. (Doc. 119-7 at 19). On June 5, 2012, based on these recommendations, the Board of Directors informed Dr. Uche that it had decided to revoke his privileges. (Doc. 119-7 at 19).

In the middle of this process, Dr. Uche filed this suit on November 7, 2011. (Doc. 1). St. Vincent's removed the suit on July 30, 2012. (Doc. 1). Dr. Uche is now operating on his Third Amended Complaint (Doc. 52), minus Counts II, III, V, and VI, which he has dismissed with prejudice (Doc. 168).

## II.    PRELIMINARY ISSUES

In addition to Defendant's Motion for Summary Judgment, a plethora of other motions are pending.

---

[7] Dr. Uche had objected to two of the seven doctors initially selected to the Committee, and they were replaced. (Doc. 119-7 at 15).

Dr. Uche filed a motion seeking to consolidate this case with a "related case" where Nurse Daniel Pratt is suing St. Vincent's Medical Center in Riverside for wrongful termination. (Doc. 174). In the affidavit attached, plaintiff in that case, a white male nurse, asserts that he was the victim of gender discrimination, as well as retaliation, after he raised issues of patient safety at the hospital. (Doc. 174-1). The cases are at vastly different stages, with the Pratt case having just been filed in April 2014, months after a summary judgment motion was filed in this case. Moreover, the cases do not appear to contain similar factual issues, as the events alleged involve different kinds of discrimination at different hospitals in different periods, with all of the relevant events in the Pratt case occurring after this case was filed. There is therefore no basis to consolidate the cases.

Dr. Uche filed a motion in limine seeking to prevent admission of 287 Quality Management Case Reports ("QMRs") under Federal Rule of Evidence 403 (Doc. 102) and St. Vincent's responded in opposition (Doc. 106). QMRs are documentation for incidents of misconduct at St. Vincent's hospitals. (See Doc. 102). St. Vincent's assured Dr. Uche in November 2011 that only 71 QMRs were considered in determining whether his privileges should be revoked. (Doc. 102 at 14). The list of the remaining 287 QMRs was used to show Dr. Uche's pattern of behavior and history of discipline. (Doc. 102 at 14). However, the details of the individual 287 QMRs were not considered by the MSEC or the Hearing Committee. (Doc. 102 at 14).

Dr. Uche does not dispute the admissibility here of the 71 QMRs used to support the revocation of his privileges at St. Vincent's. (Doc. 102 at 3). However, he asserts

that the other QMRs are irrelevant, since St. Vincent's did not use them as a basis for revoking his privileges. (Doc. 102 at 8). Moreover, Dr. Uche believes they might confuse the jury or mislead them into thinking that he was an incompetent doctor. (Doc. 102 at 8).[8] The Court will assume <u>arguendo</u> that the details of the individual 287 QMRs, which were not considered by the MSEC or the Hearing Committee, are inadmissible and the Court therefore will not consider them for the purposes of deciding the summary judgment motion. However, the <u>list</u> of those 287 QMRs was considered by the MSEC, and is important to any determination of whether Dr. Uche was treated differently than a similarly situated individual outside his protected class. That relevance far outweighs any potential prejudice. As such, the number (but not the content) of all of Dr. Uche's QMRs is relevant and admissible.

St. Vincent's filed motions seeking to exclude the expert testimony of Dr. Samuel Steinberg and Dr. Donald Marks (Doc. 147; Doc. 148) and Dr. Uche responded (Doc. 149, 150, 151, 152, 153). For purposes of this summary judgment Order, the Court rejects St. Vincent's arguments and will treat the experts' testimony as admissible. Likewise the Court will consider, contrary to St. Vincent's objections (Doc. 177), all of the exhibits (Doc. 170; Doc. 171; Doc. 172; Doc. 173) attached to Dr. Uche's response to St. Vincent's motion for summary judgment.

---

[8] Dr. Uche also asserts that the QMRs are inadmissible because they are not sufficiently trustworthy. (Doc. 102 at 7). There is no reason to believe that they were created for this litigation, nor is there any other reason to believe they are not trustworthy.

Dr. Uche asks the Court to take judicial notice of a Healthcare Practitioner Complaint Form submitted against Dr. Perry by Dr. Stephen Lalliss. (Doc. 175).[9] As Lalliss' complaint is not referenced in the motion for summary judgment, the response, or any attached exhibits, the Court need not consider it in ruling on the summary judgment motion. Moreover, Lalliss' complaint is not relevant to this case or consideration of the summary judgment motion.

Dr. Uche also asks the Court to conduct an in camera interview of Dr. James Hardy, who allegedly has confidential knowledge concerning St. Vincent's peer review hearing process. (Doc. 211 at 2). Defendant opposes that relief. (Doc. 218). Dr. Uche fails to explain why he could not have discovered Dr. Hardy's testimony earlier. Moreover, even if there were a reason for his failure to present Dr. Hardy's testimony until almost eleven months after he filed his response to Defendant's motion for summary judgment, Dr. Uche does not cite any authority for the proposition that the Court should review Dr. Hardy's testimony in camera.[10]

Finally, St. Vincent's filed a notice informing the Court that the U.S. Department of Health and Human Services denied Dr. Uche's request for reconsideration of its denial of his request to strike St. Vincent's National Practitioner

---

[9] That complaint asserts that Dr. Perry summarily suspended Dr. Lalliss to prevent him from reporting fraudulent billing activity. (Doc. 176-1).

[10] Dr. Hardy allegedly is fearful of retaliation if his testimony is provided in open court. (Doc. 211 at 2). Nevertheless, he apparently did not object to having Defendant learn that he had volunteered to be a witness for Dr. Uche. (See Doc. 211). In any event, if Dr. Hardy is unable or unwilling to testify in front of Defendant, his testimony would be inadmissible at trial.

Data Bank report on its revocation of Dr. Uche's privileges. (Doc. 210). Dr. Uche moved to strike Defendant's notice (Doc. 212) and St. Vincent's responded (Doc. 217). For the purposes of this Order, the Court declines to consider St. Vincent's notice.

## III.   LAW

Dr. Uche's Third Amended Complaint contains eight claims. (Doc. 52). Counts II (Title VII Race Discrimination), III (Florida Civil Rights Act Race Discrimination), V (Title VII Race Retaliation), and VI (Florida Civil Rights Act Race Retaliation) were previously dismissed with prejudice by agreement of the parties. (Doc. 168). St. Vincent's now seeks summary judgment on each of the remaining four claims. (Doc. 118).

### A.   Race Discrimination

Dr. Uche claims unlawful race discrimination in violation of 42 U.S.C. § 1981. (Doc. 52 at 31). Section 1981 claims based on circumstantial evidence[11] are analyzed under the three step McDonnell Douglas framework. Smith v. Lockheed-Martin Corp.,

---

[11] Plaintiff's response to the summary judgment motion asserts that he has presented "direct . . . evidence of Defendant's intentional race discrimination, unequal discriminatory treatment and retaliation motives . . . ." (Doc. 169 at 14). Direct evidence of discrimination is evidence that, if believed, proves the existence of the discrimination without any inference or presumption. Dixon v. The Hallmark Companies, Inc., 627 F.3d 849, 854 (11th Cir. 2010) (finding that a reasonable jury could find that, "You're fired, too. You're too religious" was direct evidence of discrimination). Plaintiff's filings point to no direct evidence of discrimination and there is no such evidence in the record. At oral argument, Plaintiff asserted that there is direct evidence that Dr. Uche sent e-mails to Moody Chisholm and Donnie Romine complaining about racism. (Doc. 207 at 41). For example, on October 24, 2011, Dr. Uche wrote that he believed Dr. Perry was more prone to investigate minority doctors. (Doc. 172-1 at 41). While this is evidence that Dr. Uche complained about racism, it does not constitute direct evidence of discrimination.

644 F.3d 1321, 1325 (11th Cir. 2011). First, the plaintiff must demonstrate the four elements of a prima facie case of discrimination: that he is a member of a protected class, that he was qualified for his position, that he was nevertheless discharged from the position, and that his employer treated him less favorably than a similarly situated individual outside his protected class. Id. If the plaintiff can meet those requirements, the burden shifts to the employer to show evidence that it had a legitimate, non-discriminatory reason for its action. Id. If there is such a reason, the plaintiff then must show that the employer's offered reason was mere pretext for unlawful discrimination. Id. at 1326.[12]

### 1. The Prima Facie Case

St. Vincent's argues that Dr. Uche has not demonstrated that he was treated less favorably than a similarly situated individual outside his protected class. (Doc. 118 at 16-20). To qualify as an adequate comparator, another doctor must have engaged in nearly identical conduct and have been disciplined in different ways. McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008); Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). Both the quality and the quantity of misconduct must be nearly identical for the Court to be able to draw an adequate comparison. Id.

In his response to the motion for summary judgment, Dr. Uche fails to list a single comparator. (See Doc. 169). Instead, he summarily states that he has at least

---

[12] St. Vincent's asserts that it is not an employer for the purposes of this analysis. (Doc. 118 at 10 n.13). However, as it has not moved for summary judgment on this issue (Doc. 118 at 10 n.13), the Court need not address it.

twenty adequate comparators, and asserts that St. Vincent's has admitted that he has six identical comparators. (Doc. 169 at 8 n.9). St. Vincent's, however, did not make such a concession. Instead, it argued that only hospitalists could be Dr. Uche's comparators, thus limiting the potential field of comparators from Dr. Uche's twenty to six. (Doc. 118 at 18-19). St. Vincent's differentiated Dr. Uche from the other hospitalists on the basis of the quantity of complaints against him. (Doc. 118 at 17).

Dr. Uche's complaint lists four possible comparators: Dr. C.P., Dr. I.B., Dr. K. N., and Dr. S.S. (Doc. 52 at 31). The exhibits to St. Vincent's motion for summary judgment lays out the number of quality management issues for those doctors, as well as for sixteen other doctors Dr. Uche has at some point in this case alleged to be comparable. (Doc. 119-5 at 5-6).

Dr. Uche presents little additional evidence supporting any kind of comparison between himself and another doctor.[13] Dr. Maxwell, another physician at St. Luke's, asserts that he once told Dr. Perry about another doctor improperly cutting and pasting patient histories. (Doc. 172-1 at 68). Yet, Dr. Perry appeared unconcerned about the incident and did not discipline or terminate the privileges of the offending doctor. (Doc. 172-1 at 68). Improper cutting and pasting was one of the complaints raised against Dr. Uche. (Doc. 118-5 at 2). However, a doctor improperly cutting and

---

[13] Dr. Uche has already demonstrated that he possesses the necessary QMRs to make such a showing, if it were possible, since he has previously submitted QMRs relating to allegedly comparable physicians. (See Doc. 115, 144). However, he did not attach a single QMR to his response to the motion for summary judgment.

pasting patient histories on one occasion is not sufficient evidence that that doctor engaged in nearly identical quality and quantity of misconduct as Dr. Uche.

Dr. Uche also presents Dr. Marks' deposition, in which Dr. Marks states that, at that time, he had only just begun to look at documents of allegedly dangerous actions which were much more severe than Dr. Uche's. (Doc. 170-1 at 52). This general assertion of more dangerous conduct by other doctors provides no evidence of who, exactly, engaged in nearly identical conduct to Dr. Uche but was treated more favorably. Dr. Steinberg also states that he believes "that other physicians committed the same acts" but were not subject to revocation of privileges. (Doc. 170-1 at 7). This conclusory statement likewise fails to point to who, exactly, engaged in nearly identical misconduct.

At oral argument, Plaintiff pointed to Dr. C.P., Dr. H. (presumably Dr. J.H.), and Dr. G.C. as potential comparators, but, despite pointed questions from the Court, could not explain how the quantity and quality of their misconduct was comparable to Dr. Uche's. (Doc. 207 at 43-49). While Dr. Uche insisted that those doctors also did not call patients back (Doc. 207 at 57), the only evidence in the summary judgment record shows that there is no doctor who has engaged in nearly the same quantity of misconduct as Dr. Uche, and that no other doctor's misconduct continued at such a pace even after being subject to discipline. For example, of the twenty alleged comparators, only one, Dr. G.C., had even one-third the number of QMRs as Dr. Uche. (Doc. 119-5 at 5-6).[14] Only three other physicians were suspended during Dr. Uche's

---

[14] Dr. J.H. had 27 QMRs and Dr. C.P. had 11. (Doc. 119-5 at 5-6).

time at the hospital, Dr. F.F., Dr. D.Y., and Dr. G.C. (Doc. 119-5 at 3-4). Two of those three physicians never had another QMR filed against them after their suspension. (Doc. 119-5 at 4). The third, Dr. G.C., showed improvement after his suspension, collecting 15 QMRs in the next six months, bringing his total to 155 QMRs. (Doc. 119-5 at 4-5). Dr. Uche, on the other hand, had 358 QMRs, with 60 QMRs in the four and a half months following his suspension. (Doc. 119-5 at 2, 4). Thus, no other doctor had nearly the same quantity of issues as Dr. Uche, to speak nothing of the quality of their misconduct, of which Dr. Uche has failed to present comparative evidence in the summary judgment record. As a matter of law, Dr. Uche has not made a case of racial discrimination.[15]

### 2.   Legitimate Non-Discriminatory Reason and Evidence of Pretext

Even if Dr. Uche could pass the first step of the McDonnell Douglas framework, his claim would still fail, as St. Vincent's has provided a legitimate, non-discriminatory reason for the revocation of his privileges – Dr. Uche's continued failure to follow

---

[15] Even in the absence of an adequate comparator, a plaintiff can survive summary judgment if there is "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Lockheed-Martin, 644 F.3d at 1328 (quoting Silverman v. Bd. of Educ., 637 F.3d 729, 734 (7th Cir. 2011)). Plaintiff did not argue for the existence of such a convincing mosaic in his response to the motion for summary judgment. (See Doc. 169). However, in his Response to Defendant's Notice of Supplemental Authority and Notice of Filing Supplemental Authority, Dr. Uche asserts for the first time that there is a convincing mosaic of circumstantial evidence of discrimination. (Doc. 182 at 2). No such convincing mosaic exists, as Dr. Uche's evidence consists of a stray remark by another doctor, accusations of discrimination made by another doctor, and other generalized allegations of racism.

hospital protocol and his failure to correct his behavior when given the chance to do so, thereby jeopardizing patient care and safety. (Doc. 118 at 23). This assertion is supported by the progressive discipline levied against Dr. Uche, as well as the 71 QMRs that were considered by the MSEC. (Doc. 118-5; Doc. 119-1; Doc. 119-2; Doc. 119-3; Doc. 119-4). St. Vincent's non-discriminatory reason is further bolstered by its multi-layered decision-making process, some of it favorable to Dr. Uche, [16] but eventually leading to affirmation of the revocation decision at all levels of review. Therefore, Dr. Uche must present evidence both that this reason was pretextual and that the real reason for the revocation of his privileges was racial discrimination. Springer v. Convergys Customer Mgmt. Grp. Inc., 509 F.3d 1344, 1349 (11th Cir. 2007). Dr. Uche has presented no evidence of pretext. See infra Part III.B.2. Moreover, the only evidence that racial discrimination was the real reason St. Vincent's revoked Dr. Uche's privileges is Dr. Kakkar's conclusory testimony that he feels that St. Vincent's is engaging in illegal race discrimination. (Doc. 170-1 at 68). [17] This statement is far too general to qualify as evidence that racial discrimination was the

---

[16] For example, the MSEC voted 6-3 against revoking Dr. Uche's privileges on August 1, 2011. (Doc. 118-10 at 53).

[17] In the copious exhibits filed with the Court, the only other references to race were Dr. Uche's complaints of racism, an allegation that another doctor told him to go back to Africa (Doc. 172-1 at 39), an unsupported assertion that only minority doctors have been investigated by St. Vincent's (Doc. 172-1 at 41), a complaint that various nurses were racist (Doc. 121-5 at 8), and an affidavit from a nurse at another hospital whose employment began after Dr. Uche's privileges were revoked (Doc. 215).

real reason for the revocation of Dr. Uche's privileges. Therefore, Dr. Uche's claim also fails at the pretext stage.

### B.   Race Retaliation

Dr. Uche next claims unlawful retaliation for opposing racial discrimination, in violation of § 1981. (Doc. 52 at 36-38). To establish a prima facie case of retaliation under § 1981, a plaintiff must show that he engaged in a statutorily protected activity and suffered a materially adverse employment action, and that the protected activity and adverse action were causally connected. Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008). Once the plaintiff establishes these elements, the burden shifts to the employer to provide a legitimate, non-retaliatory reason for the adverse action. Id. If the employer succeeds in this task, the plaintiff then must show that the reason provided is a mere pretext for prohibited retaliatory conduct. Id.

### 1.   The Causal Connection

St. Vincent's argues that Dr. Uche has failed to establish a prima facie case of retaliation because he cannot show that his protected activity and adverse action were causally connected. (Doc. 118 at 20-22). While Dr. Uche's response to the motion for summary judgment states that he believes that the revocation of his privileges was related to his complaints of racial discrimination, he never illustrates why or how the two events are related. (See Doc. 169). At oral argument, Plaintiff asserted that close proximity in time demonstrates a causal connection. (Doc. 207 at 56).

Dr. Uche asserts that he wrote to Moody Chisholm, St. Vincent's CEO, a number of times alleging race-based discrimination. (Doc. 173-1 at 5-7). According to Dr. Uche,

16

his correspondence with Chisholm began on August 5, 2011, and occurred again on August 8, September 16, October 1, October 7, October 20, October 24, and October 31. (Doc. 173-1 at 5-7). On June 5, 2012, Dr. Uche's privileges at St. Luke's were revoked, constituting an adverse action. (Doc. 120-9).

To establish a causal connection, the plaintiff must first show that the person making the employment decision was aware that plaintiff engaged in protected conduct. Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000). Once it has been established that the decision-maker was aware of the protected conduct, mere proximity in time may be sufficient to establish relatedness where the temporal relationship is very close. Brown v. Alabama Dep't of Transp., 597 F.3d 1160, 1182 (11th Cir. 2010). A plaintiff may be able to establish a sufficient nexus by demonstrating temporal proximity of up to a month. Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir. 1986). However, a three to four month disparity is insufficient to establish relatedness. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007).

Where a plaintiff has received repeated warnings that continued misconduct could result in a negative employment action, the causal connection is broken. Wofsy v. Palmshores Ret. Cmty., 285 F. App'x 631, 635 (11th Cir. 2008) (ruling on an ADA retaliation claim, which is assessed under the same framework as § 1981 claims); Hall v. AT & T Mobility Servs., LLC, 6:10-CV-150-ORL-28, 2011 WL 3425642, at *10 (M.D. Fla. Aug. 5, 2011). Indeed, "in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal

17

proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006).

The Board of Directors' final decision on June 5, 2012 did not occur until more than six months after Dr. Uche's last complaint of racial discrimination on October 31, 2011. This is too long a period to establish relatedness. See Thomas, 506 F.3d at 1364. Therefore, there is no evidence of a causal connection between Dr. Uche's complaints and the final decision to revoke his privileges.

Assuming arguendo that the MSEC's recommendation on September 22, 2011 that Dr. Uche's privileges be revoked was also an adverse action, Dr. Uche still must demonstrate that that recommendation was causally connected to his complaints. The members of the MSEC had knowledge of Dr. Uche's race discrimination complaints when they voted to revoke his privileges. As the CEO, either Chisholm or his designee was a member of the MSEC, albeit not a voting member.[18] (Doc. 118-3 at 52-53). Moreover, Chisholm passed at least one of Dr. Uche's complaints on to Dr. Perry, a voting member of the MSEC. (Doc. 118-2 at 185).

However, there is no causal connection between the complaints and the revocation of Dr. Uche's privileges. Before Dr. Uche first complained of racial discrimination, he had already been suspended and subjected to other increasing levels of discipline, including warnings that further misconduct would likely result in

_____

[18] As a member of the Board of Directors, however, Chisholm participated in the final unanimous decision to revoke Dr. Uche's privileges on June 5, 2012. (Doc. 172-1 at 51).

suspension or revocation of his privileges. See supra Part I. On August 1, 2011, before Dr. Uche's first complaint of discrimination, three of the nine members of the MSEC voted for Dr. Uche's privileges to be revoked immediately. (Doc. 118-10 at 53). While a majority of the MSEC voted not to revoke Dr. Uche's privileges at that time, they chose instead to suspend Dr. Uche unless he would accept serious restrictions on his privileges. (Doc. 118-10 at 54). Subsequently, the MSEC determined that this disciplinary action, as opposed to suspending Dr. Uche outright or revoking his privileges, was not an option provided for in the Medical Staff Bylaws. (Doc. 118-10 at 58). They were also given information that the explanations Dr. Uche had given for his misconduct at the August 1, 2011 meeting were untrue. (Doc. 118-10 at 58). This led to the MSEC unanimously recommending his privileges be revoked, eventually leading to the Board's June 5, 2012 revocation decision.

Thus, Dr. Uche began to complain of racial discrimination only after the progressive discipline and multi-layered review of his conduct was well underway; he has failed to demonstrate a causal connection between his discrimination complaints and the revocation of his privileges. See Drago, 453 F.3d at 1308. St. Vincent's is therefore entitled to summary judgment on the race retaliation claim.

### 2.   **Evidence of Pretext**

Even if Dr. Uche could make a prima facie case of retaliation, St. Vincent's has presented evidence of a legitimate, non-discriminatory reason for the revocation of his privileges. (Doc. 118 at 23); see supra Part III.A.2. Dr. Uche therefore must present evidence that this reason was a mere pretext for retaliatory conduct. It is not enough

for him to show that it was unfair for his privileges to be revoked, or that he was a good doctor. See Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010). It is not the Court's job to second-guess an employer's business decision. Rowell v. BellSouth Corp., 433 F.3d 794, 798 (11th Cir. 2005). Therefore, so long as St. Vincent's revoked Dr. Uche's privileges for non-retaliatory reasons, even if those reasons were mistaken or unfair, Dr. Uche's claim fails. Alvarez, 610 F.3d at 1266.

To permit a reasonable juror to conclude that the employer's reason was pretextual, there must be evidence that the employer's given reason has weaknesses, contradictions, or implausibilities indicating that it is unworthy of credence. Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005). So long as the offered reason could motivate a reasonable employer, a plaintiff must meet the reason head on and rebut it. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004). Conclusory affidavits or unsupported allegations are not sufficient to create a triable issue of fact; the plaintiff's allegations must be supported by specific facts. Carter v. City of Melbourne, Fla., 731 F.3d 1161, 1167 (11th Cir. 2013); see also Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) (granting summary judgment against a plaintiff despite an expert's conclusory statements in support of plaintiff's claim). Moreover, a plaintiff cannot establish pretext merely by arguing with the wisdom of the employer's reason if the reason is one that could motivate a reasonable employer. Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001).

Dr. Uche's response to the motion for summary judgment never clearly lays out what, specifically, he believes constitutes evidence of pretext. He does, however, make a number of assertions which could be construed as arguments for pretext.

First, Dr. Uche asserts a number of errors in the three-day peer review hearing before the Hearing Committee. St. Vincent's allegedly failed to produce certain documents at the hearing. (Doc. 169 at 12). It also did not refer the QMRs to an independent physician for evaluation before the peer review hearing. (Doc. 169 at 8).[19] Further, Dr. Uche argues that the peer review panel members were biased because Dr. Tunstill selected them. (Doc. 118-6 at 201). As Dr. Uche's prima facie case, at best, relies upon a causal connection between his complaints and the MSEC's decision,[20] he must prove that the MSEC's decision was pretextual. Evidence about the peer review hearing is not evidence that the MSEC's decision to recommend the revocation of Dr. Uche's privileges was pretextual, since the peer review hearing occurred well after the MSEC's decision was made. Nor do these alleged defects in the peer review process demonstrate that the result of that process was a pretextual decision.

Second, Dr. Uche presents a number of affidavits, asserting that he did, in fact, meet the standard of care in his cases. Dr. Hill and Dr. Castillo each reviewed one of the cases for which Dr. Uche received a QMR, and attest that he met the standard of care. (Doc. 171-1 at 7-8). Dr. Kani reviewed a different case, and stated that Dr. Uche's

---

[19] Dr. Uche has failed to point to any law or Medical Staff Bylaw that required St. Vincent's to refer QMRs for an independent evaluation. Indeed, at oral argument, Plaintiff's counsel conceded that such referral is not mandatory. (Doc. 207 at 52).

[20] Otherwise he is unable to demonstrate temporal proximity.

management of that patient was appropriate. (Doc. 171-1 at 6). Defendant's expert, Dr. Marks, asserted that Dr. Uche met the standard of care in every case. (Doc. 170-1 at 32).[21]

Neither Dr. Marks' report nor any of the doctors' affidavits demonstrate that the facts underlying any of the QMRs were false, nor do they directly rebut allegations that Dr. Uche failed to respond to calls or failed to fill out history and physical reports or discharge summaries. Instead, they merely state, in conclusory fashion, that Dr. Uche "met the standard of care". (See, e.g., Doc. 171-1 at 7).[22] The Court must determine whether Defendant revoked Dr. Uche's privileges for a retaliatory reason, not whether Defendant made a wise or fair decision in revoking Dr. Uche's privileges. See Rowell, 433 F.3d at 798. As Plaintiff's witnesses' assertions do not directly rebut St. Vincent's proffered reason and are unsupported by specifics, they are not evidence of pretext.

Third, Dr. Uche contends that a Florida State Board of Medicine Dismissal Letter represents a finding that he never compromised patient safety. (Doc. 169 at 4, 7-8). It appears that the Florida Board of Medicine has made two decisions. First, it

---

[21] Dr. Uche has also presented a chart which is labeled "A Study of Physician Callback Times at St. Luke's Medical Center." (Doc. 171-1 at 21). While this chart is never referenced in the pleadings, it is presumably intended to demonstrate that Dr. Uche returned calls more quickly than other doctors, although it seemingly covers a very small sample of only twenty of Dr. Uche's calls. There is no foundation for this exhibit, however, and there is no way of knowing where it came from or what time period it represents. Without any kind of background information, the Court cannot use this chart as evidence for Dr. Uche.

[22] The Court takes this to mean that Dr. Uche's medical treatment in these cases was appropriate.

did not revoke Dr. Uche's license. (Doc. 173-1 at 8). There is no telling whether this decision constituted a finding that Dr. Uche committed no misconduct or a finding that his misconduct did not warrant revocation of his medical license, a much more serious punishment than revocation of hospital privileges. Second, the Board dismissed a case that was brought against Dr. Uche for his failure to update his online profile to reflect the disciplinary action St. Vincent's has taken against him. (Doc. 173-1 at 8). Neither of these decisions provides any evidence of whether Dr. Uche engaged in misconduct, nor especially whether St. Vincent's was honestly dissatisfied with Dr. Uche's performance.

Fourth, Dr. Uche points to a contract St. Luke's signed with HNI Medical Services to provide hospitalist services, which was made effective on the same date as Dr. Uche's first suspension, June 10, 2011. (Doc. 170-1 at 76-77). Dr. Marks' expert report refers to this contract as evidence that St. Luke's decided to revoke Dr. Uche's privileges out of economic self-interest. (Doc. 170-1 at 36). Dr. Steinberg likewise points to the contract as evidence that Dr. Uche's discipline was driven by physicians with competitive motives. (Doc. 170-1 at 11). Even if this agreement were somehow evidence of pretext, it would be evidence that the real reason for the revocation of Dr. Uche's privileges was a desire to provide more business for hospitalists from HNI, not evidence of a retaliatory motive. Moreover, as the contract became effective before Dr. Uche's first complaints of racial discrimination, it cannot be proof that Dr. Uche was fired in retaliation for his complaints of discrimination.

Fifth, Dr. Uche presents evidence that other doctors believe his discipline was too harsh. Both of his expert witnesses assert that they do not believe Dr. Uche's privileges should have been revoked. (Doc. 170-1 at 19; 36). Dr. Steinberg states that Dr. Uche's misconduct does not rise to the level of creating a danger for patients (Doc. 170-1 at 15), and that he "can't imagine terminating a physician's privileges" for misconduct of the type Dr. Uche committed (Doc. 170-1 at 16-17). Dr. Marks asserts that Dr. Uche was only guilty of "routine issues" that did not warrant termination of his privileges. (Doc. 170-1 at 33). However, as a reasonable employer may be motivated to revoke a doctor's privileges if his failure to follow hospital protocol jeopardizes patient safety, Dr. Uche cannot demonstrate pretext merely by presenting evidence that some people disagree with St. Vincent's decision. See Pennington, 261 F.3d at 1267.

Finally, Dr. Uche submits affidavits, letters, and peer evaluations supporting his contention that he is a good doctor. For example, a St. Luke's nurse testified that she has never had any difficulty contacting Dr. Uche for any patient care issues, and that Dr. Uche is professional, well-mannered and easy to approach. (Doc. 171-1 at 2). An Advanced Registered Nurse Practitioner likewise testified that she has never had a problem reaching Dr. Uche when a patient had a critical or urgent need and she has always known Dr. Uche to be professional, friendly, and cordial. (Doc. 171-1 at 4). In anticipation of his peer review hearing, local doctors sent letters to Chisholm indicating that Dr. Uche's efficient and professional service have motivated them to admit patients to St. Luke's. (Doc. 171-1 at 9, 11). Other physicians who know Dr.

Uche likewise find him to be an excellent physician. (Doc. 171-1 at 12-15). [23]  That Dr. Uche has supporters would be relevant to determining whether he is a good doctor, or whether St. Vincent's was right to revoke his privileges. However, those questions are not before the Court. See Alvarez, 610 F.3d at 1266 (noting that an employer may fire an employee unfairly or for mistaken reasons, so long as the reason for termination is not racial or retaliatory).

To demonstrate an issue of material fact on pretext, Dr. Uche had to present evidence that St. Vincent's explanation for its revocation of his privileges had such weaknesses, contradictions, or implausibilities as to render it unworthy of credence. See Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005). As he has failed to do so, his race retaliation claim also fails at the pretext stage.

## C.    Florida Whistleblower Protection Act

Dr. Uche also asserts that his privileges were revoked in retaliation for his complaints about St. Luke's medical negligence and misdiagnoses, in violation of the Florida Whistleblower Protection Act. (Doc. 52 at 43). St. Vincent's argues that it is immune from suit because the count arises out of peer review actions. (Doc. 118 at 12). If the Court reaches the merits of the claim, St. Vincent's argues that Dr. Uche cannot establish a prima facie case of retaliation, nor can he demonstrate that the reasons given for the revocation of his privileges were pretextual. (Doc. 118 at 11-12). Dr. Uche either fails to address the whistleblower claim in his response to the motion for

---

[23]  While Dr. Uche has physician supporters, the MSEC and Hearing Committee, each of which voted unanimously to revoke Dr. Uche's privileges, were also made up of doctors.

summary judgment, or does so in such summary fashion that it makes it difficult to discern the basis for the claim. (See Doc. 169). However, the Court will try.

The complaint alleges that Dr. Uche was fired in retaliation for his complaints to management officials about negligent medical care, medical misdiagnosis, and Nurse P. working in an impaired state. (Doc. 52 at 43). Florida law prohibits an employer from taking retaliatory action against an employee because the employee has "objected to . . . any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3). This statute, called the Florida Whistleblower Protection Act, is analyzed using the same burden-shifting framework as retaliation cases under Title VII. Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000).

### 1.   **Statutory Immunity**

Florida law provides that no monetary liability can arise out of peer review proceedings in the absence of intentional fraud. Fla. Stat. § 395.0191(7). To demonstrate intentional fraud, a plaintiff must show that the defendant made a misrepresentation about a material fact, and that the defendant knew the statement to be false. See Pierson v. Orlando Reg'l Healthcare Sys., Inc., 6:08CV466-ORL-28GJK, 2010 WL 1408391, at *8 (M.D. Fla. Apr. 6, 2010) aff'd, 451 F. App'x 862 (11th Cir. 2012); Myers v. Myers, 652 So. 2d 1214, 1215 (Fla. Dist. Ct. App. 1995).

To the extent that Dr. Uche's whistleblower claim arises out of the peer review process, he argues the evidence demonstrates fraudulent acts in that process. (Doc. 169 at 16). Dr. Uche states that he has adequately demonstrated intentional fraud "by

stating with particularity the persons, the times, and the acts by which Defendant, particularly Dr. Perry and Dr. Tunstill intended to, and Plaintiff has proved by the evidence in the record that Defendant did, circumvent, cheat, deceive, or deprive Plaintiff of his legal rights . . . ." (Doc. 169 at 2). Dr. Uche cites to a number of facts which he believes demonstrate intentional fraud. He asserts that the recent introduction of the additional QMRs is evidence of intentional fraud. (Doc. 169 at 5). As, allegedly, was the suspension of Dr. Uche on June 10, 2011. (Doc. 169 at 16). St. Vincent's also allegedly failed to produce relevant comparator files and physician-patient call logs for the peer review hearing. (Doc. 169 at 6). Further, St. Vincent's represented during the peer review hearing that it did not have such call logs. (Doc. 169 at 12). Finally, Dr. Uche asserts that Drs. Perry and Tunstill refused to refer the QMRs out to an unbiased medical authority and picked biased peer review hearing members. (Doc. 169 at 16-17).

The only one of these actions that could be considered a misrepresentation of any kind in the peer review process is St.Vincent's representation that it did not have any call logs, and, relatedly, its refusal to produce any call logs.[24] Where a plaintiff alleges that a hospital knowingly withheld relevant records while misrepresenting

---

[24] While Dr. Uche similarly alleges that St. Vincent's failed to produce relevant comparator files, it is not clear what files he was not provided with, nor has Dr. Uche even alleged, much less provided any evidence of, any misrepresentation related to those files. Moreover, even if there were a misrepresentation, Dr. Uche would also have to provide evidence that St. Vincent's knew the statement was false, as the mere provision of incorrect and incomplete information, without more, is consistent with negligence, not fraud. Cedars Healthcare Grp., Ltd. v. Mehta, 16 So. 3d 914, 917 (Fla. Dist. Ct. App. 2009).

that it provided all of the records, he sufficiently alleges intentional fraud. Awwad v. Largo Med. Ctr., Inc., 8:11-CV-1638-T-24, 2011 WL 6013774, at *2 (M.D. Fla. Dec. 2, 2011). To survive summary judgment then, Dr. Uche must present at least some evidence that call logs existed, St. Vincent's knew they existed, and St. Vincent's misled the MSEC into believing the call logs did not exist.

Dr. Uche points to a letter from St. Vincent's attorney, which states that the hospital's "in-patient units have no system for documenting, outside the medical record, 'who calls back and when they call back.'" (Doc. 171-1 at 38). As evidence of this statement's falsity, Dr. Uche has presented four pages of physician call back logs. (Doc. 171-1 at 30-34). Rose Luyando's affidavit asserts that secretaries use these call back logs to record call back times. (Doc. 171-1 at 29). In her deposition, Luyando states that it was the unit clerks who were supposed to fill out call logs. (Doc. 172-1 at 5). None of these pieces of evidence suggest that, as Dr. Uche argues, these records were kept as documentation that could have been provided at the hearing.[25] Indeed, the call back logs show that almost all of the physician's names have been crossed out, and the "time call returned" space is blank for almost every entry. (Doc. 171-1 at 30-34). In other words, the logs appear to be mere pieces of scratch paper, and Dr. Uche has presented no evidence that the logs were kept as documentation. Nor has he presented any evidence that St. Vincent's attorney knew that the logs were kept as

---

[25] Interestingly, Dr. Uche testified that he would receive between 700 and 1,000 calls per month. (Doc. 118-6 at 182). Assuming an average of 850 calls a month, Dr. Uche's calls alone would fill up 729 of the 14-line call logs each year. As Dr. Uche is just one of the many doctors in the hospital, it is clear that Dr. Uche is alleging that St. Vincent's is hiding tens, if not hundreds, of thousands of pages of call logs.

documentation. Therefore, as Dr. Uche has not presented evidence of intentional fraud, his claim under the Florida Whistleblower's Protection Act fails because St. Vincent's is immune from suit.

### 2.   **The Merits of the Claim**

To the extent that Dr. Uche's whistleblower claim relies on misconduct outside of the peer review hearing, it fails on the merits. In his response to St. Vincent's summary judgment motion, Dr. Uche asserts that his privileges were revoked after he "complained to Defendant's management and corporate officials about Defendant's profit generating initiatives that compromised patient safety, the untimely and wrongful death of patient(s), the negligent medical care that contributed to a patient's death in Defendant's emergency room, [and] an impaired nurse working on duty . . . ." (Doc. 169 at 3). Despite these allegations, including that he directly communicated with Chisholm "on several occasions" to voice his concerns related to what Dr Uche "felt to be the hospital's negligence in putting corporate profit/gain over the lives and safety of the patients" there are no specifics or evidence concerning these complaints or, importantly, when they were made. (Doc. 173-1 at 4). Moreover, Dr. Uche has failed to demonstrate that the reason given for the revocation of his privileges was pretextual and that whistleblower retaliation was the real reason. As in the race retaliation context, there is no evidence of pretext and absolutely no evidence that the real reason for the revocation of Dr. Uche's privileges was retaliation for any objections that he made to St. Vincent's alleged misconduct.

**D.     Negligence**

Count VIII of the complaint alleges general negligence in the peer review process. (Doc. 52 at 44-45). Dr. Uche earlier stated that the count was due to be dismissed. (Doc. 57 at 3 n.1). As he has still not moved to dismiss it, St. Vincent's moved for summary judgment on it. (Doc. 118). Dr. Uche attempted to resuscitate the claim in his response to the summary judgment motion. (Doc. 169 at 15-18). However, as Dr. Uche agreed in his response to the motion to dismiss, the count was improper, since a doctor cannot bring a claim arising out of a peer review process unless there was intentional fraud, rather than mere negligence. Cedars Healthcare Grp., Ltd. v. Mehta, 16 So. 3d 914, 917 (Fla. Dist. Ct. App. 2009). Accordingly, this claim fails.

**E.     Breach of Contract**

Dr. Uche's response to Defendant's motion for summary judgment also seeks injunctive relief for an alleged breach of contract. (Doc. 169 at 18-19). However, Dr. Uche's Third Amended Complaint does not have a breach of contract claim. (Doc. 52).

**IV.     CONCLUSION**

There is evidence that Dr. Uche and Dr. Perry did not get along.[26] There is also evidence that some doctors and other personnel at St. Vincent's were supportive of Dr. Uche, thought him a good doctor[27] and felt he had been treated unfairly by an overbearing administration. Some also believed St. Vincent's may have had ulterior

---

[26] In fact, Dr. Uche has now filed a separate defamation action against Dr. Perry.

[27] At oral argument, even St. Vincent's counsel said he could not say that Dr. Uche is "a medically bad doctor." (Doc. 207 at 18).

business motives in dealing with Dr. Uche. Dr. Uche also was unhappy with the way St. Vincent's conducted the peer review process. But that (largely opinion) evidence does not create an issue of material fact on the specific claims of race discrimination and race and whistleblower retaliation Dr. Uche has brought. As a matter of law, Dr. Uche's claims fail.

Accordingly, it is hereby

**ORDERED:**

1.     Plaintiff's First Motion in Limine (Doc. 102) is **GRANTED in part** and **DENIED in part** as described in this Order.

2.     Defendant's Motion to Exclude the Expert Testimony of Samuel Steinberg, Ph.D. (Doc. 147) and Defendant's Motion to Exclude the Expert Testimony of Donald Marks, M.D. (Doc. 148) are **DENIED** as described in this Order.

3.     Plaintiff's Joint Motion and Memorandum of Law for Consolidation of Actions (Doc. 174) is **DENIED**.

4.     Plaintiff's Motion Requesting that the Court Take Judicial Notice of the December 7, 2013 Florida Department of Health Complaint Filed by Dr. Stephen J. Lalliss against Phil Perry, M.D. (Doc. 175) is **DENIED** as moot.

5.     Plaintiff's Motion to Set Expedited Pre-Trial Conference and Expedited Trial Date (Doc. 208) is **MOOT**.

6.     Plaintiff's Motion for In Camera Review of Dr. James Hardy (Doc. 211) is **DENIED**.

7.     Plaintiff's Motion to Strike Defendant's Notice of Supplemental Authority (Doc. 212) is **GRANTED** insofar as the Court did not consider the notice in ruling on these motions.

8.     Plaintiff's Request for an In Camera Case Status Conference (Doc. 219) is **MOOT**.

9.     Defendant's Motion for Summary Judgment (Doc. 118) is **GRANTED**.

10.     The Clerk should enter final judgment in favor of St. Lukes-St. Vincents Healthcare, Inc. and against Dr. Chidi U. Uche and should close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 5th day of February, 2015.

TIMOTHY J. CORRIGAN
United States District Judge

w.
Copies to:

Counsel of record

32